## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | |
|---|---|
| PRESSURE SPECIALIST, INC., an Illinois corporation, | ) ) ) |
| Plaintiff, | ) ) |
| vs. | ) ) ) |
| GAYSTON CORPORATION, an Ohio corporation, | ) ) ) ) |
| Defendant. | ) ) |

Case No.

```
FILED: APRIL 15, 2008
08CV2152
JUDGE COAR
MAGISTRATE JUDGE NOLAN
```

### COMPLAINT FOR INJUNCTION AND OTHER RELIEF

Now comes Plaintiff, Pressure Specialist, Inc., an Illinois corporation, by and through its attorney, Gary I. Blackman with Levenfeld Pearlstein, LLC, and for its Complaint for Injunction and Other Relief, states as follows:

### Parties

1.      Pressure Specialist, Inc. ("PSI") is an Illinois corporation with its principal place of business in Crystal Lake, Illinois.

2.      Gayston Corporation ("Gayston") is an Ohio corporation with its principal place of business in Springboro, Ohio.

### Venue and Jurisdictional Allegations

3.      Jurisdiction is proper in this judicial district for the reason that the parties have consented, within the Agreement in question, to personal and subject matter jurisdiction and venue in the United States District Court for the Northern District of Illinois for the adjudication of any dispute arising out of the Agreement in question.

4.     This Court also has jurisdiction under 28 U.S.C. Section 1332(A)(1) because there is diversity of citizenship between the Plaintiff and Defendant and the amount in controversy exceeds $75,000.00, exclusive of interest and costs.

5.     Venue is also appropriate in this judicial district under 28 U.S.C. Section 1391(A) for the reason that Plaintiff is located in the Northern District of Illinois.

## Facts Common To All Counts

6.     The parties are in the business of, *inter alia*, selling pressure bottles and valves utilized in the recreational sport of paintball.

7.     On or about August 30, 2004, the parties agreed to enter into an agreement that effectively allowed each to exclusively sell certain products made by the other. Con-Air (represented in this case by Plaintiff, PSI) agreed to allow Gayston to sell its product - pressure bottles - directly to Con-Air's customers, paying Con-Air royalties for all such bottles sold.  In exchange, Con-Air agreed, *inter alia*, to not sell pressure bottles to its customers.  Likewise, Gayston agreed that, for the term of the Agreement, it would not sell pressure valves, Con-Air's primary product, but would instead purchase the valves it needed from Con-Air.  So as to carry out the intent of the Agreement, the parties agreed to non-solicitation and non-competition provisions. See, *Con-Air/Gayston Agreement* ("Agreement"), attached as Exhibit 1.

8.     In consideration of their mutual obligations, Gayston agreed to a *Royalty Rate Schedule* (Section 3, Page 2 of Exhibit 1), as well as a *Schedule for Payment* (Section 4, Page 2 of Exhibit 1), pursuant to which Gayston agreed to make royalty payments to Con-Air by the 15th day of the month following the month in which any sales occurred.  Gayston further agreed, in Section 4(c) of the Agreement, that in event payment was not timely made, any amounts due would bear interest at the rate of one percent per month until paid.

9.    In further consideration for the benefits each would obtain under the Agreement, the parties agreed to the following non-competition provisions:

> **10(a)   For the term of this Agreement, <u>CON-AIR, its principals, employees, agents, successors, and assigns <u>will not</u>, directly or indirectly, engage or invest in, own, manage, operate, finance, control, or participate in the ownership, management, operation, financing, or control of, be employed by, lend its name or its credit to any business manufacturing or <u>selling</u>, or both, aluminum or steel pressure vessels</u> used for the storage of pressurized CO2 for paint ball uses…**

> **10(b)   For the term of this Agreement, <u>GAYSTON, its principals, employees, agents, successors, and assigns <u>will not</u>, directly or indirectly, engage or invest in, own, manage, operate, finance, control, or participate in the ownership, management, operation, financing, or control of, be employed by, lend its name or its credit to any business manufacturing <u>or selling</u>, or both, <u>pressure regulating (pin) valves</u></u> which regulate the flow of pressurized gases for paintball use…**

See, *Agreement*, Sections 10(a) and 10(b), Exhibit 1.

10.    Gayston's obligations to Con-Air are further clarified in Section 17(g) of the Agreement which provides, in pertinent part, as follows:

> **17(g)   *GAYSTON is <u>prohibited from installing Hose Shop, Ltd./CON-AIR Systems (valves) on any bottles for sale</u> to customers listed on Attachment A or Attachment B unless such valves have been supplied by Hose Shop, Ltd/CONAIR to the customers or by Hose Shop, Ltd/CONAIR directly to Gayston for the purpose of such installation…***

11.    The Agreement provided for a Termination Date of August 31, 2009, however, Gayston was also provided with the option of an early termination pursuant to a *Buyout Claus*e (Section 6, Page 3 of Exhibit 1) which provides as follows:

> **6.   *Gayston may terminate this Agreement at any time by paying Con-Air an amount equal to $2,800,000 less the total amount of royalties previously paid under this Agreement to Con-Air*.**

12.    Subsequent to the execution of the Agreement, the parties agreed that Plaintiff, PSI, would be substituted as the real party in interest for Con-Air.  All royalty payments were thereafter sent by Gayston to PSI.

3

## COUNT I
### (Mandatory Permanent Injunction)

13.     PSI has come to learn that Gayston has begun to manufacture or prepare for manufacture, marketing or distribution a combined pressure bottle and valve system (the "IVT Program") that incorporates into its pressure bottles a valve that serves the same function as those sold by PSI.

14.     The incorporation (or sale) by Gayston of valves utilized in recreational paintball products of the type sold by PSI (Con-Air), violates those provisions in the Agreement that specifically prohibit Gayston from selling valves in competition with PSI.  By doing so, Gayston has destroyed the essence of the Agreement, which was to allow two parties who had previously sold each other's products to sell only one product exclusively, pressure bottles for Gayston and valves for PSI.

15.     PSI possesses a protectible interest given its rights under the Agreement.

16.     PSI possesses a likelihood of prevailing on the merits of its claim.  Based on Sections 10(a) and 10(b), as well as Section 17(g), Gayston is expressly prohibited from installing pressure system valves (on any bottles manufactured by Gayston for sale) unless agreed to by PSI.  Anything less destroys the non-competition provisions and defeats the original intent of the parties and the exclusive nature of the Agreement.

17.     PSI never agreed to the incorporation of valves not purchased from PSI in any Gayston products.

18.     The Agreement specifically prohibits the conduct engaged in by Gayston; specifically prohibits the sale of valves that could otherwise be sold by PSI to Gayston under the Agreement; and specifically contemplates, through its various non-competition clauses, that each party be prevented from effectively competing with the other with respect to the items identified.

There are no provisions in the Agreement that allow Gayston to sell its own pressure system valves, whether separately or incorporated in a system such as the IVT Program.

19.    Gayston agreed, in the Agreement, to injunctive relief without bond. The Agreement further provides that each party is entitled to obtain injunctive or other equitable relief against the other to restrain any breach or threatened breach by the other or otherwise to specifically enforce the provisions of the Agreement and further agreed that money damages alone would be inadequate to compensate either party for the breach by the other of the non-solicitation or non-competition clauses. See, *Paragraphs 8(d) (Confidentiality); 9(c) (Non-Solicitation); 10(e) (Non-Competition)*, *Agreement*, Exhibit 1.

20.    In addition to the parties' agreement in this regard, Plaintiff does not possess an adequate remedy at law. No remedy at law will preclude or prevent Defendant from violating the Agreement by selling competing products in direct violation of both the letter and spirit of the Agreement.

21.    PSI will be irreparably harmed by the actions undertaken by Gayston.

WHEREFORE, Plaintiff, Pressure Specialist, Inc., respectfully requests that this Court enter the following relief against Defendant, Gayston Corporation:

A.    A temporary, preliminary and mandatory permanent injunction (without bond) prohibiting Gayston from installing, selling, manufacturing or distributing in any way or in any fashion, paintball system valves including, but not limited to, of the type sold by Plaintiff and contemplated within the Agreement until the termination of the Agreement;

B.    For an accounting of all valves or valve systems manufactured, imported or sold by Gayston during the term of the Agreement;

C.    For other relief as this Court deems just.

## COUNT II
### (Breach of Contract)

22.    The Agreement entered into between the parties is a valid, binding and enforceable agreement.

23.    Pursuant to Paragraphs 3, 4 and 5 of the Agreement, Gayston was to pay PSI royalties in a specific amount, at a specific time, based on the amount sales made by Gayston.

24.    Gayston has not made timely payments of all royalties owed PSI and is, therefore, in breach of the Agreement.

25.    As a direct and proximate result of Gayston's breach of the Agreement, PSI is owed, as of January 1, 2008, $79,683.00 plus interest, costs, attorneys' fees and any royalties for sales made after January 1, 2008.

26.    PSI has fully complied with all its obligations under the Agreement.

27.    Pursuant to Paragraph 4(d) of the Agreement, PSI is entitled to reimbursement of all attorneys' fees and costs it will incur in enforcing the Agreement including, but not limited to, enforcing its right to collection of royalty payments.

WHEREFORE, Plaintiff, Pressure Specialist, Inc., respectfully requests that this Court enter a Judgment in its favor and against Gayston Corporation in the amount of $79,683.00 plus interest, all attorneys' fees, costs and royalties owed after January 1, 2008.

Dated:  April 15, 2008                                   Pressure Specialist, Inc.


By:_____/s/ Gary I. Blackman_____
                                                                One of its Attorneys

Gary I. Blackman
LEVENFELD PEARLSTEIN, LLC
2 N. LaSalle St., Suite 1300
Chicago, Illinois 60602
(312) 346-8380 - Telephone
(312) 346-8434 - Facsimile
Attorney No. 36518

08CV2152
JUDGE COAR
MAGISTRATE JUDGE NOLAN

# EXHIBIT 1

## AGREEMENT BETWEEN
## GAYSTON CORPORATION AND CON-AIR SYSTEMS, INC.

This Agreement (the "Agreement") is entered into this *30ᵀᴴ* day of *AUGUST,* 2004 (the "Effective Date") by and between GAYSTON CORPORATION, an Ohio corporation having its principal place of business in Springboro, Ohio ("GAYSTON"), and CON-AIR SYSTEMS, INC., an Illinois CORPORATION having its principal place of business in Crystal Lake, Illinois ("CON-AIR").

### WITNESSETH:

WHEREAS, GAYSTON and CON-AIR both are in the business of selling pressure bottles for paintball use; and

WHEREAS, GAYSTON and CON-AIR are party to an Exclusive Manufacturing and Supply Agreement dated May 10, 2001 (the "Prior Agreement"); and

WHEREAS, GAYSTON and CON-AIR wish to terminate the Prior Agreement and to agree to terms on which GAYSTON will sell such pressure bottles, as defined in Attachment D, directly to CON-AIR customers and also to new customers, paying CON-AIR royalties for all such bottles sold; and

WHEREAS, the parties wish to set forth the terms and conditions of their understanding in the Agreement.

NOW, THEREFORE, in consideration of the terms and conditions hereof, the sufficiency of which is hereby acknowledged, the parties agree as follows.

1.    <u>CON-AIR Account List</u>.  Attached as Attachment A and incorporated herein is a list of customers to which CON-AIR currently sells or has previously sold pressure bottles for paintball use.  The list of customers on Attachment A shall be referred hereinafter as the "CON-AIR Account List."  GAYSTON will not sell directly to customers on the CON-AIR Account List until September 1, 2004.  Thereafter, CON-AIR will cease selling directly to customers on the CON-AIR account list, except that CONAIR will be permitted to sell an additional quantity of 10,080 12 oz bottles to Kingman after August 31, 2004.  GAYSTON will pay royalties to CON-AIR based on the quantity of pressure bottles sold by GAYSTON to customers on the CON-AIR Account List in accordance with the applicable royalty rates set forth below, in Paragraph 3.

2.    <u>GAYSTON Account List</u>.  Attached as Attachment B and incorporated herein is a list of current and prospective customers which are not part of the CON-AIR customer list.  The list of customers on Attachment B shall be referred hereinafter as the "GAYSTON Account List."  The parties intend that the GAYSTON Account List will be reviewed from time to time at the request of either party and shall be revised to include new customers and to delete customers as changes occur.  The approval by both parties of such changes to the GAYSTON Account List will be required.  GAYSTON may begin to sell to customers on the GAYSTON Account List on the Effective date of this Agreement, except that Gayston may also sell a quantity of 9,12 & 20 oz bottles to Brass Eagle prior to the Effective date of this Agreement.  GAYSTON will pay royalties to CON-AIR based on the quantity of pressure bottles sold by GAYSTON to customers on

the GAYSTON Account List in accordance with the applicable royalty rates set forth below, including the,9,12, 20 oz bottles sold to Brass Eagle prior to the Effective date of this Agreement.

3.    <u>Royalty Rate Schedules</u>.

(a)    The Standard Royalty Rate for payment by GAYSTON to CON-AIR per bottle sold for all types and sizes of bottle will be $.60 for sales in Year 1, $.55 for sales in Year 2, $.45 for sales in Year 3, $.30 for sales in Year 4, and $.25 for sales in Year 5. Year 1 shall mean the period beginning on the date of execution of this Agreement through August 31, 2005; Year 2 shall mean the period beginning September 1, 2005 through August 31, 2006; Year 3 shall mean the period from September 1, 2006 through August 31, 2007; Year 4 shall mean the period from September 1, 2007 through August 31, 2008; Year 5 shall mean the period from September 1, 2008 through August 31, 2009.

(b)    Attached as Attachment C and incorporated herein is a Special Royalty Rate Schedule which sets forth royalty rates for specific customers, bottle types and bottle sizes and which the parties may change by mutual consent from time to time. When applicable, the rates on Attachment C shall control and the rates set forth in Section 3(a) hereof shall not.

(c)    The Standard Royalty Rates are based on "bottle only" selling prices represented to GAYSTON by CON-AIR for customers on the CON-AIR Account List. The benchmark "bottle only" selling prices so represented are as follows:

TIPPMANN
9 oz   $10.05 less $2.75 valve less $.25 valve install = $7.05
12 oz   $11.45 less $2.75 valve less $.25 valve install = $8.45
20 oz   $13.45 less $2.75 valve less $.25 valve install = $10.45

KINGMAN
9 oz   $10.05 less $2.45 valve less $.25 valve install = $7.35
12 oz   $11.16 less $2.45 valve less $.25 valve install = $8.46
20 oz   $12.89 less $2.45 valve less $.25 valve install = $10.19

If reductions in "bottle only" pricing for bottles sold by GAYSTON to customers on the CON-AIR Account List are required, the Standard Royalty Rate Schedule shall be reviewed upon GAYSTON's request and revised by mutual written consent of the parties. Alternatively, the parties may respond to price fluctuations by revision by mutual consent of the Special Royalty Rate Schedule set forth in Attachment C.

(d)    The term "Bottle", "Bottles", "Pressure Bottles" and/or "Product" or "Products" as used herein is defined in Attachment D.

4.    <u>Payment of Royalties</u>.

(a)    The date of sale shall determine the royalty rate. Amounts received by GAYSTON during a month for the sale of pressure bottles to customers on either the CON-AIR Account List or the GAYSTON Account List will be totaled, the royalties owed

–2–

to CON-AIR calculated based on the applicable rate in effect at the time of the sale of the pressure bottles, and payment made to CON-AIR by the 15th day of the following month. GAYSTON will provide CON-AIR at the time of payment with documentation verifying the number of bottles for which payments were received during and for the month in question and a report summarizing the calculation of the royalty, along with a sales report showing sales made to customers. GAYSTON agrees to issue separate royalty checks to specified entities or persons as directed by CON-AIR systems.

(b)    GAYSTON does hereby consent to allow CON-AIR, its auditors and employees, the right to audit records of GAYSTON relative to verifying sales quantity and payments. GAYSTON shall timely cooperate in providing such information for said audit. CON-AIR shall give GAYSTON 10 days written notice of its desire to audit said records and GAYSTON shall provide access to its facility and records within 20 days after receipt of said notice. The audit shall take place at Gayston's offices and the cost of any such audit shall be paid exclusively by CON-AIR.

(c)    In the event payment is not timely, then the amount due shall bear interest at the rate of 1% per month until paid.

(d)    In the event of a default hereunder, then the defaulting party shall pay such costs and attorney's fees as may be incurred by the non-defaulting party in enforcing the terms of this Agreement. This provision shall not only apply for the non-payment of royalties but for any default of any term of this Agreement.

5.    **Minimum and Maximum Royalties.**

(a)    If, as of August 31, 2009, the cumulative royalties paid to CON-AIR under this Agreement are less than $2,400,000.00, the payment of royalties to CON-AIR will continue and will be calculated using the royalty rates set forth above for the fifth year of the Agreement, until the total of royalty payments reaches $2,400,000.00 or until CON-AIR has been paid royalties for sales of pressure bottles through August 31, 2010 including any retroactive royalties due under Attachment C, which ever occurs first.

(b)    If, during the term of this Agreement, the cumulative royalties paid to CON-AIR reaches $2,800,000.00, no additional royalties will be paid to CON-AIR under this Agreement, and this Agreement will terminate when the royalties paid to CON-AIR reach such figure.

6.    **Buy-Out.**    GAYSTON may terminate this Agreement at any time by paying CON-AIR an amount equal to $2,800,000.00 less the total amount of royalties previously paid under this Agreement to CON-AIR.

7.    **Marketing Information.**    CON-AIR will provide GAYSTON with information concerning CON-AIR's prior sales and marketing activity concerning pressure bottles and any current information that it may obtain from time to time which could be of value to GAYSTON in the direct marketing and selling of pressure bottles. The information to be provided shall be as determined by CON-AIR.

8.    **Confidentiality.**

(a)    **Confidentiality of this Agreement.**    The terms of this Agreement and all

correspondence, negotiations and oral communications relating hereto are Confidential Information (as defined below). Both CON-AIR and GAYSTON agree not to disclose any information relating to this Agreement or any such correspondence, negotiations and oral communications to any third party (except to their attorneys and professional advisors and other representatives and agents as may be required in order to perform their obligations under this Agreement, or such disclosure as required by law provided that the party receiving notice of an obligation to disclose provides the non-disclosing party prior written notice of the compelled disclosure a reasonable time prior to disclosure and cooperates with the non-disclosing party to seek appropriate protective measures) without the prior written consent of the other party, except that either party may disclose the existence of such an Agreement.

(b)  Confidentiality and Proprietary Information. Confidential and Proprietary Information shall include the terms of this Agreement, information relating to actual or prospective customers of CON-AIR or GAYSTON (including, without limitation, business and customer forecasts and projections) and all other information disclosed by CON-AIR or GAYSTON or prepared for or provided by CON-AIR or GAYSTON in connection with this Agreement. Each party will not, directly or indirectly, for its own benefit or for the benefit of any person or entity, other than the other party in accordance with or pursuant to this Agreement, use, copy, divulge, disseminate, disclose or communicate to any person or entity any of the Confidential Information of the other party in any manner whatsoever without the prior written consent of the non-disclosing party. Notwithstanding the above, either party may disclose Confidential Information if so required by law, provided that the party receiving notice of an obligation to disclose provides the non-disclosing party prior written notice of the compelled disclosure a reasonable time prior to disclosure and cooperates with the non-disclosing party to seek appropriate protective measures.

(c)  Return of Confidential Information. The parties, upon the earlier of the expiration of the Term or the termination of this Agreement or within fifteen (15) days after either party's request therefor, shall return to the other party all Confidential Information of the other party, including all copies and reproductions thereof, and all writings and recordings incorporating or referring to the other party's Confidential Information and certify in writing to the other party that it has satisfied all of its covenants, duties and obligations pursuant to this Section.

(d)  Remedy for Default. In the event of a disclosure of Confidential Information by a defaulting party, other than as permitted under the terms of this Agreement, the non-defaulting party shall be entitled to an injunction restraining the defaulting party, its officers, employees or agents, who have made or are about to make such disclosure, from making or continuing the same without the necessity of the non-defaulting party showing or proving actual damage sustained by the non-defaulting party and without the necessity of posting a bond. In the event of an uncured default under this Agreement by either party, the non-defaulting party, in addition to injunctive relief, shall be entitled to all other remedies provided for by law or equity, including an awards of damages.

9.  Non-Solicitation.

(a) (i)  Non-Solicitation of Customers. So long as GAYSTON is not in default of any of the terms of this Agreement, and so long as GAYSTON'S breach or default is not the result of or otherwise caused by CON-AIR or by a breach or default under this

Agreement by CON-AIR, and in an effort to further protect GAYSTON'S proprietary interest in GAYSTON'S Confidential Information and GAYSTON'S current and prospective customer relationships, CON-AIR covenants and agrees that for the Term of this Agreement, unless solely on behalf of GAYSTON or unless CON-AIR obtains the prior written consent of GAYSTON, CON-AIR its principals, employees, agents, successors, and assigns, shall not either individually, or in association or in combination with any other person or entity, directly or indirectly, as proprietor or owner, or officer, director or shareholder of any corporation, or as a manager or member of a limited liability company, or as an employee, agent, independent contractor, consultant, advisor, joint venture, partner or otherwise, whether or not for pecuniary benefit, solicit, divert, sell to, provide services to, or assist the solicitation of, diversion of , sale to, or providing to, or encourage, induce or entice any other person on either the CON-AIR Account List or the GAYSTON Account List ("Customer") for the purpose of:  (i) providing any such Customer with the same or substantially the same products and/or services or any product or service that competes with the products or services; (ii) altering, modifying or precluding the development of Customer's business relationship with GAYSTON; or (iii) reducing the volume of business which any such Customer transacts or has agreed to transact with GAYSTON.

(a) (ii) So long as CON-AIR is not in default of any of the terms of this Agreement, and so long as CON-AIR's breach or default is not the result of or otherwise caused by GAYSTON or by a breach or default under this Agreement by GAYSTON, and in an effort to further protect CON-AIR's proprietary interest in CON-AIR's Confidential Information and CON-AIR's current and prospective customer relationships, GAYSTON, its principals, employees, agents, successors, and assigns, covenants and agrees that for the Term of this Agreement, unless otherwise in accordance with the terms of this Agreement, or unless GAYSTON obtains the prior written consent of CON-AIR, GAYSTON shall not either individually, or in association or in combination with any other person or entity, directly or indirectly, as proprietor or owner, or officer, director or shareholder of any corporation, or as a manager or member of a limited liability company, or as an employee, agent, independent contractor, consultant, advisor, joint venture, partner or otherwise, whether or not for pecuniary benefit, solicit, divert, sell to, provide services to, or assist the solicitation of, diversion of, sale to, or providing to, or encourage, induce or entice any other person or entity not on either the CON-AIR Account List or the GAYSTON Account List ("Customer") for the purpose of:   (i) providing any such person or entity with the same or substantially the same products and/or services or any product or service that competes with the products or services; (ii) altering, modifying or precluding the development of such person or entity's business relationship with CON-AIR; or (iii) reducing the volume of business which any such person or entity transacts or has agreed to transact with CON-AIR.

(b)    Non-Solicitation of Employees and Independent Contractors.  To further protect the parties, both parties agree that during the term of this Agreement, neither party will individually or in association or in combination with any other person or entity, directly or indirectly, encourage, induce or entice any employee or independent contractor of the other party to terminate such person's or entities' employment or other relationship with that party.

(c)    Remedy for Default.  In the event of a default of this Section 9, other than as permitted under the terms of this Agreement, the non-defaulting party shall be entitled to an injunction restraining the defaulting party, its officers, employees or agents, who have made or are about to make such default, from making or continuing the same

without the necessity of the non-defaulting party showing or proving actual damage sustained by the non-defaulting party and without the necessity of posting a bond. In the event of an uncured default under this Agreement by either party, the non-defaulting party, in addition to injunctive relief, shall be entitled to all other remedies provided for by law or equity, including an award of damages.

(d)    <u>Acknowledgements by Parties</u>. The parties hereby acknowledge that the restrictions set forth in Section 8 above and this Section 9 are reasonable in scope and necessary for the protection of the business and goodwill of the parties and will not prevent the parties from continuing as a going concern.

10.    <u>Non-Compete</u>.

As an inducement for each other to enter into the Agreement the parties agree as follows:

(a)    For the term of this Agreement, CON-AIR, its principals, employees, agents, successors, and assigns will not, directly or indirectly, engage or invest in, own, manage, operate, finance, control, or participate in the ownership, management, operation, financing, or control of, be employed by, lend its name or its credit to any business manufacturing or selling, or both, aluminum or steel pressure vessels used for the storage of pressurized CO2 for paint ball uses as defined in Attachment D1; provided, however, that CON-AIR may purchase or otherwise acquire up to (but not more than) one percent of any class of securities of any enterprise (but without otherwise participating in the activities of such enterprise) if such securities are listed on any national or regional securities exchange or have been registered under Section 12(g) of the Securities Exchange Act of 1934.

(b)    For the term of this Agreement, GAYSTON, its principals, employees, agents, successors, and assigns will not, directly or indirectly, engage or invest in, own, manage, operate, finance, control, or participate in the ownership, management, operation, financing, or control of, be employed by, lend its name or its credit to any business manufacturing or selling, or both, pressure regulating (pin) valves which regulate the flow of pressurized gases for paintball use; provided, however, that GAYSTON may purchase or otherwise acquire up to (but not more than) one percent of any class of securities of any enterprise (but without otherwise participating in the activities of such enterprise) if such securities are listed on any national or regional securities exchange or have been registered under Section 12(g) of the Securities Exchange Act of 1934.

(c)    <u>Nondisparagement</u>. Neither party will disparage the other party or any of its shareholders, directors, officers, employees, or agents.

(d)    <u>Scope</u>. If any covenant in this Section 10 is held to be unreasonable, arbitrary, or against public policy, such covenant will be considered to be divisible with respect to scope, time, and geographic area, and such lesser scope, time, or geographic area, or all of them, as a court of competent jurisdiction may determine to be reasonable, not arbitrary, and not against public policy, will be effective, binding, and enforceable against the breaching party.

(e)    <u>Remedies</u>. In addition to its right to damages and any other rights it may have if the other breaches the covenants set forth in Section 10 of this Agreement,

each party will be entitled to obtain injunctive or other equitable relief to restrain any breach or threatened breach or otherwise to specifically enforce the provisions of Section 10 of this Agreement, it being agreed that money damages alone would be inadequate to compensate the party and would be an inadequate remedy for such breach.

11.    <u>Indemnification.</u>

(a)    <u>By GAYSTON.</u>    GAYSTON agrees to indemnify, defend and hold harmless CON-AIR and its officers, directors, employees, shareholders, agents, attorneys, successors and assigns (each an "Indemnitee") from and against all claims, demands, damages, judgments, liabilities, costs and expenses, including reasonable attorney's fees, arising out of, relating to or in connection with (i) GAYSTON's breach of any of GAYSTON's agreements, covenants, warranties, duties or obligations under this Agreement; or (ii) GAYSTON's infringement of any copyright, trade secret, trademark, service mark, design or other personal or proprietary rights of any third party (collectively, "Third Party Intellectual Property") of GAYSTON's trademarks, trade names, service marks, designations and logos (collectively, the GAYSTON Trademarks") or any other designated brands, marks, logos or designs of GAYSTON on the products or packaging thereof; (iii) the death of or injury to any person, damage to any property, or any other damage or loss, by whomsoever suffered, resulting or claimed to result in whole or in part from any actual or alleged defect in the aluminum bottles, and/or installation of the valves utilized in the products, whether latent or patent, including actual or alleged improper design, manufacture or construction of the aluminum bottles or any claim of strict liability in tort relating to the aluminum bottles manufactured by GAYSTON; or (iv) any other third party claim with respect to GAYSTON's performance of its obligations under this Agreement or for the manufacture of the aluminum bottles and/or installation of the valves utilized in the products.

(b)    <u>By CON-AIR.</u>    CON-AIR agrees to indemnify, defend and hold harmless GAYSTON and its officers, directors, employees, shareholders, agents, attorneys, successors and assigns (each an "Indemnitee") from and against all claims, demands, damages, judgments, liabilities, costs and expenses, including reasonable attorney's fees, arising out of, relating to or in connection with (i) CON-AIR's breach of any of CON-AIR's agreements, covenants, warranties, duties or obligations under this Agreement; or (ii) CON-AIR's infringement of any copyright, trade secret, trademark, service mark, design or other personal or proprietary rights of any third party (collectively, "Third Party Intellectual Property") or CON-AIR's trademarks, trade names, service marks, designations and logos (collectively, the "CON-AIR Trademarks") or any other designated brands, marks, logos or designs of CON-AIR on the products or packaging thereof; (iii) the death of or injury to any person, damage to any property, or any other damage or loss by whomsoever suffered, resulting or claimed to result in part form any actual or alleged defect in the products (excluding the manufacture of the aluminum bottles and/or the installation of the valves utilized in the products), whether latent or patent, including actual or alleged improper design, manufacture or construction of the products (excluding the manufacture of the aluminum bottles and/or the installation of the valves utilized in the Products) or any claim of strict liability in tort relating to the products; or (iv) any other third party claim with respect to CON-AIR's performance of its obligations under this Agreement or the products.

(c)    <u>Notice and Defense.</u>    If either party to this Agreement becomes aware of any claim or demand for which it believes it is entitled to indemnity from the other party

(each an "Indemnitor") under this Agreement, such party will give the Indemnitor written notice of such claim; provided, however, that the failure to give prompt notice shall not relieve the Indemnitor from its obligations hereunder unless the failure to give prompt notice has materially and adversely affected the Indemnitor's defense of such claim. The Indemnitor shall defend such claim, at the Indemnitor's sole cost and expense, with counsel of the Indemnitor's own choosing, reasonably acceptable to the Indemnitee, provided that the Indemnitee shall, at the Indemnitor's sole cost and expenses, provide the Indemnitor with such assistance as the Indemnitor may reasonably request in order to defend such claim.  If the Indemnitor fails to defend any claim for which the Indemnitee is entitled to indemnification hereunder, the Indemnitee may defend such claim with counsel of the Indemnitee's own choosing, and the Indemnitor shall reimburse the Indemnitee for all reasonable costs and expenses incurred by the Indemnitee in defending, settling or compromising such claim, including, without limitation, court costs, costs of investigation and reasonable attorneys' fees as and when the Indemnitee presents statements to the Indemnitor for payment.

(d)    <u>No Settlement</u>.  The Indemnitor shall not settle or compromise any claim for which the Indemnitee is entitled to indemnification by the Indemnitor without the prior written consent of the Indemnitee, which consent shall be at the Indemnitee's sole discretion, provided that the Indemnitor may settle any claim for which it is defending and indemnifying the Indemnitee without the consent of, but upon prior written notice to, the Indemnitee if such claim may be settled or compromised solely by the payment of money by the Indemnitor and without the Indemnitee admitting any liability whatsoever or otherwise being restricted in any way in the operation of its business due to such settlement or compromise, and provided further that the Indemnitee receives a full and complete release of the Indemnitee for any such claim.

(e)    <u>Survival of Indemnification Obligations</u>.  GAYSTON's and CON-AIR's respective indemnification obligations under this Agreement shall survive the expiration of the Term or the termination of this Agreement.

12.    <u>Termination of Prior Agreement.</u>

The Prior Agreement shall be terminated as of the effective date of this Agreement.

13.    **Application Law**
This Agreement is to be governed by and construed according to the laws of the State of Illinois, without giving effect to its conflict of laws rules. The parties hereby agree and consent to the personal and subject matter jurisdiction and the venue of the federal or state courts, as applicable, sitting in McHenry County, Illinois, for the adjudication of any dispute arising from, or the interpretation of, this Agreement.

14.3.    <u>Severability.</u>

If any provision of this Agreement is determined to be invalid or unenforceable by a court of competent jurisdiction, such provision shall be severed herefrom and such invalidity or unenforceability shall not affect the validity or enforceability of any other part or provision of this Agreement, the balance of which will remain in and have its intended full force and effect; provided, however, that if said invalid or unenforceable provision may be modified so as to be valid and enforceable as a matter of law, such provision will be deemed to have been modified so as to be valid

and enforceable to the maximum extent permitted by law.

154.  Notices.

Any notice required or communication required or permitted by this Agreement or by law to be served on or given to either party hereto to the other party shall be in writing and delivered or sent to:

To CON-AIR:            CON-AIR Systems, Inc.
                       186 Virginia Road
                       Crystal Lake, Illinois  60014
                       Attn:  President John Ripkey
                       Facsimile No.:  (815) 477-7395

With a required copy to:  Militello, Zanck & Coen, PC
                       40 Brink Street
                       Crystal Lake, Illinois  60014
                       Attn:  James G. Militello, Esq.
                       Facsimile No.:  (815) 459-8429

To GAYSTON:            GAYSTON Corporation
                       200 South Pioneer Boulevard
                       Springboro, Ohio  45066-0430
                       Attn:  President Mark Stone
                       Facsimile No.:  (937) 746-7566

With a required copy to:  Buechner, Haffer, O'Connell,
                          Meyers & Healey Co., LPA
                       105 East Fourth Street, Suite 300
                       Cincinnati, Ohio  45202
                       Attn:  Robert J. Meyers, Esq.
                       Phone No.:  (513) 579-1500
                       Facsimile No.:  (513) 977-4361
                       Email:  rmeyers@bhomh.com

Each party may change its address for purposes of this Agreement by written notice to the other party.  All notices or other communications shall be deemed duly served and given on the date when personally delivered to the party to whom it is directed, when transmitted electronically by facsimile or email, in each case with confirmation of delivery, or upon delivery when sent by registered or certified mail, postage prepaid, or express delivery service which keeps a record of deliveries.

165.  Relationship of the Parties.

(a)    Independent Contractors.  The relationship of the parties is solely that of seller and buyer.  The parties are and shall remain mutual independent contractors.  No employees of CON-AIR shall be deemed to be employees of GAYSTON for any purpose whatsoever, and no employees of GAYSTON shall be deemed to be employees of CON-AIR for any purpose whatsoever.

(b)    No Joint Venture.  Nothing in this Agreement is intended to create any joint venture, partnership, or agency relationship between the parties, and neither party

shall have authority to obligate, to act as representative for, or to make statements or commitments on behalf of the other for any purposes, except as expressly consented to by the other in writing or as set forth in this Agreement.

176.   **Miscellaneous.**

(a)   This Agreement contains the entire agreement and understanding by and between the parties, and no representations, promises, agreements, or understandings, written or oral, not contained herein shall be of any force or effect. No change or modification of this Agreement shall be valid or binding unless it is in writing and signed by the party intended to be bound. No waiver of any provision of this Agreement shall be valid unless it is in writing and signed by the party against whom the waiver is sought to be enforced. No valid waiver of any provision of this Agreement at any time shall be deemed a waiver of any other provision in this Agreement at such time or at any other time. This Agreement is binding on and shall inure to the benefit of each party and its successors and assigns.

(b)   This Agreement may not be assigned by CON-AIR without the prior written consent of GAYSTON nor by GAYSTON without the prior written consent of CON-AIR. GAYSTON does hereby consent to the assignment of the Agreement by CON-AIR to Hose Shop, Ltd.

(c)   Wherever the word "consent" is used in this Agreement, it shall be written consent.

(d)   In the event for any reason either party cannot agree on any change or revision to either customer list or rate revisions, then the customer list and/or royalty rate schedules as herein set forth shall control.

(e)   Notwithstanding anything herein to the contrary, the term of this Agreement shall commence on the date hereof and continue until August 31, 2009 except as otherwise provided in Paragraphs 5(a), 5 (b), or 6 hereof.

(f)   GAYSTON is prohibited from selling any bottles as defined in Attachment D.1. to any party unless said party is listed on Attachment A or Attachment B hereof.

(g)   GAYSTON is prohibited from installing Hose Shop, Ltd./CON-AIR Systems (valves) on any bottles for sale to customers listed on Attachment A or Attachment B unless such valves have been supplied by Hose Shop, Ltd/CONAIR to the customers or by Hose Shop, Ltd/CONAIR directly to Gayston for the purpose of such installation. Gayston agrees to notify CONAIR if any customers who previously had Gayston install valves supplied by Hose Shop, Ltd/CONAIR subsequently notify Gayston of their intent to provide a different valve for installation by Gayston

(h)   Notwithstanding anything to the contrary herein, there is nothing in this Agreement that prohibits John Ripkey, CON-AIR or Hose Shop, Ltd., from manufacturing, selling or servicing of valves, or any other product, other than bottles as defined in Attachment D.1, to any person or entity.

18.   **Counterparts and Facsimile Delivery.**

This Agreement may be executed in two or more identical counterparts, each of which shall be deemed to be an original and all of which taken together shall be deemed to constitute the Agreement when a duly authorized representative of each party has signed a counterpart. The parties may sign and deliver this Agreement by facsimile transmission. Each party agrees that the delivery of the Agreement by facsimile shall have the same force and effect as delivery of original signatures and that each party may use such facsimile signatures as evidence of the execution and delivery of the Agreement by all parties to the same extent that an original signature could be used.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the Effective Date.

CON-AIR:

CON-AIR SYSTEMS, INC.
An Illinois Corporation

By: _John Ripkey_
Name:  John Ripkey
Title:  President

GAYSTON:

GAYSTON CORPORATION
An Ohio Corporation

By: _Mark W. Stone_
Name:  Mark Stone
Title:  President

80921.1

ATTACHMENT A

CON-AIR SYSTEMS, INC. ACCOUNT LIST

The following is a list of customers to whom CON-AIR Systems, Inc. is currently or has previously sold bottles for paintball use --

    Tippmann Pneumatics
    Kingman / Java
    Crosman Corporation
    Archon Paintball

This list is not subject to revision.

Approved by _____ Date _8·30·04_
    For Gayston Corporation

Approved by _____ Date _8-26-04_
    For CON-AIR Systems, Inc.

80916.1

ATTACHMENT B

GAYSTON ACCOUNT LIST

The following is a list of current or prospective customers, not for inclusion on the CON-AIR Systems, Inc. Account List, to whom Gayston is authorized to make direct sale of bottles for paintball use.

> PMI, Inc.
> Brass Eagle
> CON-AIR Systems, Inc.

This list is subject to revision by the mutual agreement of both parties and supersedes any previously dated Attachment B.

Approved by _Mark W. Stone_     Date _8-30-04_
For Gayston Corporation

Approved by _John Rich_     Date _8-26-04_
For CON-AIR Systems, Inc.

80918.1

ATTACHMENT C

SPECIAL ROYALTY RATE SCHEDULE

The following is a Special Royalty Rate Schedule to be used for calculation of CON-AIR Systems Inc. royalty in lieu of the Standard Royalty Rate Schedule included in the Agreement for those customers and for those bottle types and sizes as listed below –

**PMI, Inc. –**
Royalty rate per bottle to be $.00 for all types and sizes of all pressure bottles sold during all years of the Agreement, except that a royalty rate of $.07 per bottle will be used to calculate a retroactive royalty if the cumulative payment of royalties at the end of the royalty payment period as defined in Paragraph 5a of the Agreement is less than $2,400,000.00. This retroactive royalty will be calculated by using only a sufficient quantity of bottles sold to PMI over the term of the Agreement as is necessary to increase the cumulative payment of royalties to $2,400,000.00. If the entire quantity of bottles sold to PMI over the term of the Agreement is not sufficient to calculate a retroactive royalty large enough to bring the cumulative payment of royalties to $2,400,000.00, then the retroactive royalty will be paid as calculated only on the quantity of bottles sold, and Con-Air shall be entitled to no further royalty payments, even though the total paid under the Agreement is less than $2,400,000. For purposes of the retroactive royalty calculation, only bottle quantities sold to PMI in excess of the total number of bottles for which there were open PMI orders on the Effective Date of the Agreement will be included. The payment of any retroactive royalty will be made within 30 days of the end of the term of the Agreement.

**Brass Eagle –**
Royalty rate per 9 oz. CO2 pressure bottle to be $.50 per bottle for all bottles sold during Year 1 of the Agreement.

Royalty rate per 9 oz. CO2 pressure bottle to be $.45 per bottle for all bottles sold during Year 2 of the Agreement.

**CONAIR, Inc. –**
Royalty rate per bottle to be $.00 for all types and sizes of all pressure bottles sold during all years of the Agreement.

**TIPPMANN PNEUMATICS –**
Royalty rate per 9, 12 or 20 oz. CO2 pressure bottle to be $.70 per bottle for all bottles sold during Year 1 of the Agreement.

Royalty rate per 9, 12 or 20 oz. CO2 pressure bottle to be $.65 per bottle for all bottles sold during Year 2 of the Agreement.

This list is subject to revision by the mutual agreement of both parties and supersedes any previously dated Attachment C.

Approved by _Mark W. Stine_____    Date _8-30-04_
                    For Gayston Corporation

Approved by _____    Date _8-26-04_
                    For CON-AIR Systems, Inc.

80919.1

## ATTACHMENT D

1.      The term "bottle", "bottles", "pressure bottles", "product", or "products" means aluminum or steel bottle with a working pressure of 1800 PSI with a capacity of 1 to 48 ounces used for the storage of pressurized $CO_2$ for paintball use.

2.      Clarification as to "bottle".

GAYSTON and CON-AIR mutually agree that they have discussed the possibility that an aluminum or steel 3000 PSI pressure bottle may be manufactured and sold by GAYSTON in the future, and that in such event an additional royalty rate will be established by mutual agreement of the parties for the 3000 PSI pressure bottles manufactured and sold by Gayston. Any royalties paid under this clarification shall apply to the minimum and maximum royalty provisions of paragraph 5 of the Agreement, and shall also apply to the buy out provisions of paragraph 6 of the Agreement. The parties need not reach agreement on the royalty rate to be paid on 3000 PSI pressure bottles as a pre-condition to GAYSTON's right to manufacture and sell 3000 PSI pressure bottles. GAYSTON currently does not offer such a pressure bottle and understands and agrees that CON-AIR SYSTEMS currently purchases, sells, and markets pressure bottles with working pressures of 3000 PSI and higher for the storage of pressurized gases. Notwithstanding, CON-AIR SYSTEMS is free to sell, purchase, manufacture, and market aluminum, steel or other pressure bottles for inert gases with a working pressure of 3000 PSI or higher, and Gayston will not sell 3000 PSI or higher pressure bottles for use with pepper or mace balls without written consent from CONAIR.

Approved by _Mark W Stire_          Date _8-30-04_
           For GAYSTON Corporation

Approved by _____          Date _8-26-04_
           For CON-AIR Systems, Inc.

ATTACHMENT C

SPECIAL ROYALTY RATE SCHEDULE – *REVISED*

Pursuant to Paragraphs 3b and 3c of the Agreement between Gayston Corporation and CON-AIR Systems Inc., this Attachment C "Special Royalty Rate Schedule" has been revised by mutual consent of the parties and applies for calculation and payment of royalties in lieu of the Standard Royalty Rate Schedule included in the Agreement for those customers and for those bottle types and sizes as listed below –

**Special Royalty Rate for Year 3 of the Agreement –**
*A Special Royalty Rate will be used to calculate royalties for all types and sizes of all 1800 and 3000 PSI pressure bottles covered under the Agreement which are sold during Year 3 of the Agreement, as defined therein, of an amount per bottle equal to four and one quarter percent (4 ¼ %) of the net "bottle only" selling price. This Special Royalty Rate for Year 3 will apply to all bottle sales to all customers on the Gayston and CON-AIR Account Lists, except that the Special Royalty provisions listed below for the sale of bottles to PMI and CON-AIR will continue to apply.*

**PMI, Inc. –**
Royalty rate per bottle to be $.00 for all types and sizes of all pressure bottles sold during all years of the Agreement, except that a royalty rate of $.07 per bottle will be used to calculate a retroactive royalty if the cumulative payment of royalties at the end of the royalty payment period as defined in Paragraph 5a of the Agreement is less than $2,400,000.00. This retroactive royalty will be calculated by using only a sufficient quantity of bottles sold to PMI over the term of the Agreement as is necessary to increase the cumulative payment of royalties to $2,400,000.00. If the entire quantity of bottles sold to PMI over the term of the Agreement is not sufficient to calculate a retroactive royalty large enough to bring the cumulative payment of royalties to $2,400,000.00, then the retroactive royalty will be paid as calculated only on the quantity of bottles sold, and Con-Air shall be entitled to no further royalty payments, even though the total paid under the Agreement is less than $2,400,000. For purposes of the retroactive royalty calculation, only bottle quantities sold to PMI in excess of the total number of bottles for which there were open PMI orders on the Effective Date of the Agreement will be included. The payment of any retroactive royalty will be made within 30 days of the end of the term of the Agreement.

**Brass Eagle –**
Royalty rate per 9 oz. CO2 pressure bottle to be $.50 per bottle for all bottles sold during Year 1 of the Agreement.

**CON-AIR, Inc. –**
Royalty rate per bottle to be $.00 for all types and sizes of all 1800 and 3000 PSI pressure bottles sold during all years of the Agreement.

**TIPPMANN PNEUMATICS –**
Royalty rate per 9, 12 or 20 oz. CO2 pressure bottle to be $.70 per bottle for all bottles sold during Year 1 of the Agreement.

This Special Royalty Rate Schedule is subject to revision by the mutual agreement of both parties and supersedes any previously revised and dated Attachment C.

Approved by _____    Date _12/8/06_
For Gayston Corporation

Approved by _____    Date _12/12/06_
For CON-AIR Systems, Inc.

80919.1

ATTACHMENT C

SPECIAL ROYALTY RATE SCHEDULE – *REVISED*

Pursuant to Paragraphs 3b and 3c of the Agreement between Gayston Corporation and CON-AIR Systems Inc., this Attachment C "Special Royalty Rate Schedule" has been revised by mutual consent of the parties and applies for calculation and payment of royalties in lieu of the Standard Royalty Rate Schedule included in the Agreement for those customers and for those bottle types and sizes as listed below –

**Special Royalty Rate for Year 2 of the Agreement –**
*A Special Royalty Rate will be used to calculate royalties for all types and sizes of all 1800 and 3000 PSI pressure bottles covered under the Agreement which are sold during Year 2 of the Agreement, as defined therein, of an amount per bottle equal to four and one quarter percent (4 ¼ %) of the net "bottle only" selling price. This Special Royalty Rate for Year 2 will apply to all bottle sales to all customers on the Gayston and CON-AIR Account Lists, except that the Special Royalty provisions listed below for the sale of bottles to PMI and CON-AIR will continue to apply.*

**PMI, Inc. –**
Royalty rate per bottle to be $.00 for all types and sizes of all pressure bottles sold during all years of the Agreement, except that a royalty rate of $.07 per bottle will be used to calculate a retroactive royalty if the cumulative payment of royalties at the end of the royalty payment period as defined in Paragraph 5a of the Agreement is less than $2,400,000.00. This retroactive royalty will be calculated by using only a sufficient quantity of bottles sold to PMI over the term of the Agreement as is necessary to increase the cumulative payment of royalties to $2,400,000.00. If the entire quantity of bottles sold to PMI over the term of the Agreement is not sufficient to calculate a retroactive royalty large enough to bring the cumulative payment of royalties to $2,400,000.00, then the retroactive royalty will be paid as calculated only on the quantity of bottles sold, and Con-Air shall be entitled to no further royalty payments, even though the total paid under the Agreement is less than $2,400,000. For purposes of the retroactive royalty calculation, only bottle quantities sold to PMI in excess of the total number of bottles for which there were open PMI orders on the Effective Date of the Agreement will be included. The payment of any retroactive royalty will be made within 30 days of the end of the term of the Agreement.

**Brass Eagle –**
Royalty rate per 9 oz. CO2 pressure bottle to be $.50 per bottle for all bottles sold during Year 1 of the Agreement.

**CONAIR, Inc. –**
Royalty rate per bottle to be $.00 for all types and sizes of all 1800 and 3000 PSI pressure bottles sold during all years of the Agreement.

**TIPPMANN PNEUMATICS –**
Royalty rate per 9, 12 or 20 oz. CO2 pressure bottle to be $.70 per bottle for all bottles sold during Year 1 of the Agreement.

This Special Royalty Rate Schedule is subject to revision by the mutual agreement of both parties and supersedes any previously revised and dated Attachment C.

Approved by *Mark W. Stone*                 Date 12/10/05
For Gayston Corporation

Approved by _____     Date 12/27/05
For CON-AIR Systems, Inc.
*PSI*

80919.1